ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
BENJAMIN R. BARRON (Cal. Bar No. 257094)
JENNIFER L. WILLIAMS (Cal. Bar No. 268782)
Assistant United States Attorneys
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-3542/5862
    Facsimile:  (213) 894-0142
    E-mail:     ben.barron@usdoj.gov
    E-mail:     jennifer.williams6@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR No. 11-1075-SJO |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S POSITION RE: PSR |
| | ) | AND SENTENCING OF DEFENDANT |
| v. | ) | VINCENT VO; DECLARATION OF |
| | ) | BENJAMIN R. BARRON; EXHIBITS |
| VINCENT VO, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby files its Position regarding the Presentence Investigation Report (PSR) and the Sentencing of Defendant Vincent Vo. The government submits that a sentence that includes an ten-month term of imprisonment, half of which would be served in home confinement, a three-year period of supervised release, and a special assessment of $100, is

1  sufficient, but not greater than necessary, to comply with the

2  goals of sentencing.  In addition, the government seeks

3  restitution in the amount of $13,138.

4       This document is based upon the attached memorandum of

5  points and authorities and exhibits thereto, the PSR disclosed to

6  the parties on February 4, 2013, the files and record in this

7  case, and any other evidence or argument that the Court may wish

8  to consider at the time of sentencing.

9  DATED: May 23, 2013              Respectfully submitted,

10                                  ANDRÈ BIROTTE JR.
                                    United States Attorney
11
                                    ROBERT E. DUGDALE
12                                  Assistant United States Attorney
                                    Chief, Criminal Division
13

14                                  _____/s/_____
                                    BENJAMIN R. BARRON
15                                  JENNIFER L. WILLIAMS
                                    Assistant United States Attorneys
16
                                    Attorneys for Plaintiff
17                                  UNITED STATES OF AMERICA

18

19

20

21

22

23

24

25

26

27

28                                      2

TABLE OF CONTENTS

                                                          PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . .    ii

**MEMORANDUM OF POINTS AND AUTHORITIES** . . . . . . . . . . . 1

I. Introduction . . . . . . . . . . . . . . . . . . .    1

II.   Facts Relevant to Defendant's Sentencing . . . . . . . .    2

     A.   The *Modus Operandi* of the Scheme . . . . . . . . .    2

     B.   Evidence Specifically Pertaining to Defendant . . . .    4

III. The Presentence Report . . . . . . . . . . . . . . .    6

IV.   Analysis Under 18 U.S.C. § 3553(a)  . . . . . . . . .   12

V.    Conclusion   . . . . . . . . . . .   15

DECLARATION OF BENJAMIN R. BARRON . . . . . . . . . . .   16

TABLE OF AUTHORITIES

PAGE(S)

**FEDERAL CASES**:

United States v. Bachynsky,
    949 F.2d 722 (5th Cir. 1991) . . . . . . . . . 10, 11

United States v. Hoogenboom,
    209 F.3d 665 (7th Cir.  2000) . . . . . . . . . 9

United States v. Rutgard,
    116 F.3d 1270 (9th Cir. 1997) . . . . . . . . . 10

United States v. Scrivener,
    189 F.3d 944 (9th Cir. 1999) . . . . . . . . . 9

**STATUTES**:

Title 18, United States Code:

    Section 1028A . . . . . . . . . . . . . . . 13

    Section 3553(a)  . . . . . . . . . . 1, 12, 2, 15

    Section 3553(a)(2)(B), (C) . . . . . . . . . 15

Title 42, United States Code:

    Section 1320a-7b(b)(1)(A) . . . . . . . . . 1

**MISCELLANEOUS**:

United States Sentencing Guideline:

    Section 1B1.3 . . . . . . . . . . . . . . . 9

    Section 2B1.1  . . . . . . . . . . . . . . 9

    Section 2B1.1(a)(2)  . . . . . . . . . . . . 6, 7

    Section 2B1.1(b)(10) . . . . . . . . . . . . 7

    Section 2B1.1(b)(10)(C) . . . . . . . . . . . 1

    Section 2B1.1(b)(11) . . . . . . . . . . . . 7

    Section 2B1.1(b)(11)(A) . . . . . . . . . . . 1

    Section 2B1.1(b)(1)(C) . . . . . . . . . . . 6, 7

    Section 2B1.1(b)(1)(H) . . . . . . . . . . . 7

TABLE OF AUTHORITIES

PAGE(S)

**MISCELLANEOUS**:

United States Sentencing Guideline:

Section 3A1.1   . . . . . . . . . . . . . . . . . 9

Section 3B1.1(a)(1)   . . . . . . . . . . . . . . 7

Section 3B1.2(b)   . . . . . . . . . . . . . . 2, 7

Section 3A1.1(b)(1)   . . . . . . . . . . . . passim

Section 3E1.1   . . . . . . . . . . . . . . . 6, 7

Section 5C1.1(d)(2)   . . . . . . . . . . . 13, 15

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. Introduction

On November 29, 2012, defendant Vincent Vo ("defendant") pled guilty to one count of Solicitation and Receipt of Kickbacks for the Receipt of a Benefit from a Federal Health Care Program, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A) (United States Probation Office Presentence Report ("PSR") ¶¶ 1-2.) The conviction stems from defendant's involvement in a sophisticated scheme to defraud Medicare and Medi-Cal health care benefit programs, resulting in an actual loss to the victim programs of nearly $8,000,000 and an intended loss of more than $18,000,000.[1]

On February 4, 2013, the United States Probation Office ("USPO") disclosed the PSR, calculating defendant's sentencing range under the United States Sentencing Guidelines (the "guidelines" or "U.S.S.G.") at 0 to 6 months of imprisonment. The government calculates defendant's offense level differently. Specifically, the government recommends that the Court apply: (1) a two-level increase under § 2B1.1(b)(10)(C) because the offense involved the possession or use of any authentication feature; (2) a two-level enhancement under § 2B1.1(b)(11)(A) because the offense involved sophisticated means; (2) a two-level increase under U.S.S.G. § 3A1.1(b)(1) because "defendant knew or should have known that a victim of the offense was a vulnerable

---

[1] Defendant was separately charged in Los Angeles County Superior Court with offenses related to the underlying criminal conduct. On February 7, 2013, defendant pled guilty to a violation of Welfare and Institutions Code 14107.2, also related to the receipt of kickbacks, for which defendant was sentenced on that date to a 36-month term of probation.

1  victim;" and (3) a two-level reduction for defendant's minor

2  role, under § 3B1.2(b).

3     Accordingly, the appropriate Guidelines range is 10 to 16

4  months imprisonment based on a total offense level of 12.

5  Pursuant to the Guideline calculation and 18 U.S.C. § 3553(a),

6  the government submits that a restitution order in the amount of

7  $13,138 and a sentence that includes an eight-month term of

8  imprisonment, a three-year period of supervised release, a

9  special assessment of $100, is sufficient, but not greater than

10 necessary, to comply with the goals of sentencing.

11    The government agrees with the PSR finding that, given the

12 significant restitution in this case, and defendant's lack of

13 income, any fine should be waived.

14     **II.   Facts Relevant to Defendant's Sentencing**

15 **A.   The *Modus Operandi* of the Scheme**

16     The health care fraud conspiracy in which defendant

17 participated operated in sum as follows:[2] Co-defendants Arman

18 GRIGORYAN, Lianna OVSEPIAN, Nurista GRIGORYAN, and Artak OVSEPIAN

19 operated a purported medical clinic, Manor Medical Imaging, Inc.

20 ("Manor"), in Glendale, California.  In the scheme, Manor

21 generated thousands of fraudulent prescriptions for expensive

22 anti-psychotic medications ("Psych Meds") for Manor's "patients"

23 -- low-income beneficiaries of government funded health care

24 programs, such as Medicare and Medi-Cal -- who did not in fact

25

26 _____

27     [2]  Unless otherwise indicated, the facts are taken from the
   Indictment, the PSR, and the Affidavit of Task Force Officer
   Larra Wilbur, sworn to and submitted in support of the criminal

28 complaint in this case.

1 need the Psych Meds.  Those prescriptions appeared to be signed

2 and issued by co-defendant Kenneth JOHNSON, a medical doctor,

3 when in fact co-defendant JOHNSON did not issue or lawfully

4 authorize the Manor Prescriptions, nor did defendant JOHNSON

5 examine Manor's "patients."  Indeed, based on the investigation,

6 which included months of surveillance via a pole camera

7 positioned on Manor, co-defendant JOHNSON was rarely at Manor and

8 instead allowed other Manor employees to falsely pose as medical

9 professionals and to issue the prescriptions using his name and

10 Medi-Cal and Medicare billing information.

11      Defendant and other co-conspirators (including Lisa Danielle

12 MENDEZ; Anthony Glen JONES; David SMITH; and Richard Bond

13 WASHINGTON) worked as patient recruiters who brought and directed

14 the beneficiaries to Manor with the promise of a cash payment.

15 Upon arriving a Manor, defendant and co-conspirators ushered

16 beneficiaries through the clinic's back door, so as to not

17 attract attention from the busy street, as the beneficiaries

18 often traveled in large groups from city busses or car pools with

19 recruiters.  Once inside, each beneficiary presented his or her

20 health care program identification card and received a fraudulent

21 prescription for one Psych Med and at least one other drug, which

22 was added to the prescriptions, again, in an effort to avoid

23 suspicions.

24      After the prescriptions were provided to the beneficiaries,

25 co-conspirators (including Edgar HOVANNISYAN, Artur HARUTYUNYAN,

26 Mikayel GHUKASYAN, and Artyom YEGHIAZARYAN), loaded beneficiaries

27 into vans used by Manor and took them to pharmacies, where, under

28

1    the supervision of defendant and his co-conspirators, the
2    beneficiaries filled the fraudulent prescriptions.  As the
3    defendants knew (because they would only pay beneficiaries who
4    had current health care program coverage), the pharmacies would
5    bill Medicare (via the beneficiaries' prescription drug plans) or
6    Medi-Cal for each of the fraudulent prescriptions.

7         However, not all beneficiaries participated in the scheme by
8    receiving and filling prescriptions.  The identities of other
9    Medicare and Medi-Cal beneficiaries were stolen from them and
10   were used without those beneficiaries' consent or knowledge.  As
11   a result, beneficiaries were denied coverage for drugs that they
12   in fact needed because of other drugs that were fraudulently
13   filled using their identities.

14        Importantly, the prescriptions were filled when possible, in
15   the medication's original packaging (instead of the amber colored
16   bottles).  All the filled prescriptions were provided to the co-
17   conspirators and returned to Manor; the beneficiaries then
18   received a cash payment (around $100) and were dropped off at a
19   parking lot or bus stop.  From Manor, the medications were
20   repackaged (if not already in original packaging) and diverted
21   into the black market where they would be sold to other
22   pharmacies and likely re-billed to health care programs as though
23   the drugs were being issued for the first time.

24   B.   **Evidence Specifically Pertaining to Defendant**

25        Defendant used his position as a driver for organizations
26   assisting elderly Vietnamese individuals with Medicare benefits
27   to obtain and steal their personal information in furtherance of
28

1   the fraud.   Specifically, defendant recruit those persons by
2   deceiving them into believing that they were receiving legitimate
3   treatment, following which their identities would be stolen; that
4   is, the beneficiaries' Medi-Cal and Medicare numbers would be
5   used to fill Manor prescriptions without their knowledge or
6   consent.   Attached as Exhibit A are reports of interviews with
7   some of the beneficiaries recruited by defendant (identified by
8   his Vietnamese name "Minh"), detailing how defendant deceived
9   them into providing their Medicare information.
10   Defendant would bring some of them to the Manor clinic on
11   the pretense that they would receive a legitimate examination,
12   when in fact the examination was a sham and a pretense to obtain
13   the beneficiaries' Medicare and other personal information.   Some
14   of the beneficiaries did not speak English and thus were not
15   aware of what was happening when they were at Manor or the nature
16   of documents that they signed.   See, e.g., Exhibit A at 79.
17   Another elderly beneficiary that defendant brought to Manor,
18   N.P., suffers from memory loss and requires continual
19   supervision; nevertheless, N.P.'s Medicare benefits were used to
20   fill eleven Manor prescriptions over three months.   See Exhibit A
21   at 108-09.   When one of the beneficiaries asked for documentation
22   of the visit, the Manor conspirators refused to provide it and
23   said that "everything was fine."   See Exhibit A at 72.
24   Defendant take other elderly Vietnamese beneficiaries to
25   receive massage or acupressure treatment.   There, with
26   defendant's assistance, the beneficiaries would fill out forms
27   disclosing personal identifying information, such as information
28

1  relating their Medicare benefits; here again, the some of the
2  beneficiaries did not know what they were signing.  <u>See</u> Exhibit A
3  at 79, 82.  The Manor conspirators would then write and fill
4  prescriptions in those individuals' names without their knowledge
5  or consent.  The beneficiaries did not in fact receive the drugs
6  filled using their Medicare benefits, nor did they in fact take
7  Psych Meds.

8       Between about September 2009 and October 27, 2011, the day
9  of the takedown, the related pharmacies submitted no less than
10 approximately $18,045,398 in claims to Medicare or Medi-Cal for
11 at least 21,075 fraudulent Manor prescriptions.  Medicare and
12 Medi-Cal actually paid the pharmacies a combined amount of
13 approximately $7,291,419 for 14,705 of those claims.

14                **III. The Presentence Report**
15      The USPO, using the 2012 Guideline Edition, calculates
16 defendant's total offense level as follows:

17       Base Offense Level:        6      [U.S.S.G. § 2B1.1(a)(2)]

18       Loss Amount:              +4      [U.S.S.G. § 2B1.1(b)(1)(C)]

19       Acceptance of
         Responsibility:          -2      [U.S.S.G. § 3E1.1]
20
         **Total Offense Level:        8**
21
(PSR ¶¶ 25-35.)  The PSR also calculates a criminal history
22
category of I based on zero criminal history points.  (PSR ¶¶ 39-
23
40.)  Based on a total offense level of 8 and a criminal history
24
category of I, the PSR determines the Sentencing Guideline range
25
as follows: 0 to 6 months of imprisonment; one to three years of
26
supervised release; and a fine between $1,000 and $10,000.  (PSR
27
p. 3).
28

The government agrees with the PSR finding that a plus-four enhancement applies for amount of loss, under U.S.S.G. § 2B1.1(b)(1)(C).  (PSR ¶ 26).

In addition, however, the government submits that defendant's Guideline calculation should include a <u>two-level increase</u> under § 2B1.1(b)(10) and an additional <u>two-level increase</u> under § 2B1.1(b)(11) because the offense involved sophisticated means as well as the possession and use of authentication features, namely the beneficiaries' Medicare identification numbers.  Additionally, the government submits the Guideline calculation should include a <u>two-level increase</u> under U.S.S.G. § 3B1.1(a)(1) because defendant's offense involved a vulnerable victim and, in fact, it involved multiple vulnerable victims.  Finally, the government moves for a <u>two-level decrease</u> for minor role under U.S.S.G. § 3B1.2(b).

Accordingly the government asks this court to calculate, under the 2010 Guideline Edition, as follows:

| | | | |
|---|---|---|---|
| Base Offense Level: | 6 | [U.S.S.G. § 2B1.1(a)(2)] |
| Loss Amount: | +4 | [U.S.S.G. § 2B1.1(b)(1)(H)] |
| Authentication feature: | +2 | [U.S.S.G. § 2B1.1(b)(10)] |
| Vulnerable Victims: | +2 | [U.S.S.G. § 3B1.1(a)(1)] |
| Minor Role: | -2 | [U.S.S.G. § 3B1.2(b)] |
| Acceptance of Responsibility: | -2 | [U.S.S.G. § 3E1.1] |
| **Total Offense Level:** | **12** | |

<u>Sophisticated Means and Use of an Authentication Feature</u>: The Court has already ruled on the applicability of enhancements

7

1   for sophisticated means and use of an authentication feature in

2   sentencing co-defendant GHUKASYAN; the Court applied both

3   enhancements.   The Court's reasoning also applies to defendant.

4   The government briefly addresses those enhancements here and will

5   respond in greater detail if necessary in a responsive pleading.

6        Regarding the sophistication of the scheme, the government's

7   argument is identical to its position with respect to GHUKASYAN.

8   Defendant participated in the scheme aware of the salient

9   features that made it sophisticated, including the recruitment of

10  beneficiaries, the provision of sham physical examinations at a

11  purported medical clinic, the use of beneficiaries to fill

12  fraudulent prescriptions at pharmacies, the theft of

13  beneficiaries' identities, the payments of kickbacks to

14  beneficiaries in exchange for receiving "medical" treatment, and

15  the illegal profits stemming from the fraud.

16       Regarding the use of authentication features, as the

17  government previously argued and the Court agreed, the scheme

18  could not function without the use of authentication features, in

19  particular Medicare numbers.   Indeed, defendant admitted in his

20  plea agreement that he knew that co-conspirators at the Manor

21  clinic used the beneficiaries' Medicare benefits were used to

22  submit fraudulent billings.   See Plea Agreement at 7.

23       Vulnerable victim: The facts as to defendant are

24  distinguished - and are particularly aggravating - on a

25  significant issue.   As to the beneficiaries recruited by SMITH,

26  MENDEZ, JONES, and WASHINGTON, the evidence establishes at most

27  that those individuals were recruited to knowingly fill

28

1   fraudulent Manor prescriptions in exchange for money.  All of the

2   interviewed beneficiaries connected to defendant, by contrast,

3   provided a detailed explanation of the ways that their identities

4   were stolen and their Medicare benefits used without their

5   knowledge and consent.  These individuals are, without a doubt,

6   vulnerable victims under the Guidelines.

7        The Guidelines impose a two-level increase if the offense

8   involved a vulnerable victim.  See U.S.S.G. § 3A1.1(b)(1).  The

9   Application Notes explains that the term "vulnerable victim"

10  means "a person (A) who is a victim of the offense of conviction

11  and any conduct for which the defendant is accountable under §

12  1B1.3 (Relevant Conduct); and (b) who is unusually vulnerable due

13  to age, physical or mental condition, or who is otherwise

14  particularly susceptible to the criminal conduct."  Additionally,

15  the Application Notes explain that the defendant "must have known

16  of the victim's unusual vulnerability."  While § 3A1.1 does not

17  define the term "victim," § 2B1.1 does provide a definition.

18  Under Application Note 4(e) of that section, "in a case involving

19  means of identification" the definition of "victim" includes "any

20  individual whose means of identification was used unlawfully or

21  without authority."  As the Ninth Circuit has held, "A single

22  vulnerable victim is sufficient to support application of the

23  enhancement."  United States v. Scrivener, 189 F.3d 944 (9th Cir.

24  1999).

25       The vulnerable victim enhancement has been applied in cases

26  involving the same or similar factual circumstances present here.

27  In United States v. Hoogenboom, 209 F.3d 665, 670 (7th Cir.

28

                                  9

2000), the Seventh Circuit held that elderly and infirm nursing home patients were "vulnerable victims" for purpose of enhancing defendant's sentence for scheme to defraud Medicare program by collecting reimbursement for services not performed using those individuals' Medicare benefits.  Similarly, the Ninth and Fifth Circuits have held that a vulnerable victim enhancement applies where a medical doctor commits Medicare or insurance fraud usnig his patients' benefits.  See United States v. Rutgard, 116 F.3d 1270, 1293 (9th Cir. 1997) (applying enhancement where doctor submitted false claims using patients' Medicare information); United States v. Bachynsky, 949 F.2d 722, 735-36 (5th Cir. 1991) (applying enhancement where defendant submitted false claims to government and insurance companies, and noting that "while relying on Dr. Bachynsky's ineffective course of treatment, his patients may have been foregoing more effective, safer, and legitimate treatments elsewhere").

Based on the foregoing caselaw, the facts in this case establish that there was at least one vulnerable victim in this case and, indeed, that there were multiple vulnerable victims identified.  The evidence summarized above shows that defendant specifically targeted a vulnerable group, namely, elderly Vietnamese individuals recruited from senior care centers. Defendant was able to coax them to provide their information by making them believe that they were receiving legitimate treatment such as massage and acupressure.  Exhibit A provides an example of a beneficiary suffering from Alzheimer's, N.P.  See Exhibit A at 108-11.  Given the age that defendant targeted, and that he

1  targeted those individuals from senior care centers, it is

2  reasonable to conclude that other recruited beneficiaries were

3  mentally infirm.   Additionally, other beneficiary/victims did not

4  speak English and thus could not understand what was happening at

5  the clinic.   Id. at 0077, 00107.

6      Those individuals actually taken to Manor were also

7  vulnerable victims in the sense that some of them were led to

8  believe that they were in fact receiving legitimate care which,

9  as in the cases above, may have prevented them from seeking other

10 care that they in fact needed.   Indeed, employees at Manor told

11 at least one victim that "everything was fine" when in fact

12 Manor's purported medical examination was fraudulent.   Id. At

13 0072.   For such beneficiaries who were unwitting participants in

14 the fraud and left Manor believing that they had received a

15 legitimate examination, defendant created the serious danger that

16 they would not later see a legitimate physician and thus would

17 not identify medical conditions that could have been treated.

18     Finally, the beneficiaries were vulnerable victims through

19 their reliance on Medicare to receive coverage for drugs that

20 they in fact needed.   All of the victims in Exhibit A were

21 receiving drugs that they actually needed and that were

22 legitimately prescribed to them by doctors not connected to the

23 fraud.   By using their Medicare coverage fraudulently, defendant

24 and his co-conspirators placed them in danger of being denied

25 coverage for those drugs.   They also were placed in danger of

26 having doctors refrain from prescribing them drugs they needed

27 based on review of their drug prescription history, which

28

1   included the multiple drugs fraudulently prescribed and filled by

2   the conspirators.   This danger is not theoretical; during the

3   investigation agents identified an identity theft victim who was

4   denied coverage for drugs he actually needed because the

5   defendants in this case had stolen his identity.   See Exhibit B

6   at 2:16-19.   This concern is of particular significance as to

7   defendant: for those beneficiaries recruited by defendant with

8   mental infirmity, there was an even greater risk of serious delay

9   in reporting and fixing the problem.

10      Minor Role: Although the foregoing facts are certainly

11   aggravating, the government also submits that defendant served a

12   reduced role relative to other recruiters with respect to the

13   volume of beneficiaries recruited.   Defendant is less culpable

14   than other recruiters such as SMITH and MENDEZ, who participated

15   in the scheme throughout the investigation and are responsible

16   for exponentially greater fraudulent billings than defendant.

17   Unlike SMITH and MENDEZ, who were involved in the scheme

18   throughout the investigation and were often seen by surveillance

19   at the Manor clinic, defendant was not seen at Manor by agent

20   surveillance and the evidence shows that defendant participated

21   in the scheme for a limited period early in the investigation

22   (mid-2010).   Accordingly, the government moves for a two-level

23   reduction for minor role.

24          **IV. Analysis Under 18 U.S.C. § 3553(a)**

25      Both the nature and circumstances of defendant's offense and

26   the history and characteristics of defendant warrant the

27   recommended sentence of ten months imprisonment, five months of

28

                              12

which would be served in home detention as a condition of supervised release.  See U.S.S.G. § 5C1.1(d)(2).  Such a sentence adequately reflects the substantial aggravating considerations in this matter, while still reflecting that defendant served a lesser role than other participants in the scheme.

The PSR reflects certain mitigating considerations, in particular defendant's lack of criminal history and that defendant spent much of his life under the governing regime in Vietnam.  (PSR ¶¶ 39-40, 46-52.)  Defendant's experiences include the evacuation of his home during the Vietnam War and his having witnessed "a great deal of death" as a teenager during the war.  (PSR ¶ 48.)  Because of these circumstances, the government recommends that defendant should serve a portion of his term of imprisonment in home detention.  Furthermore, these mitigating circumstances are accounted for by the significant benefits defendant received under the plea agreement, in particular the government's agreement to move to dismiss charges against defendant under 18 U.S.C. § 1028A, which carry a 24-month mandatory consecutive term of imprisonment.  They are also reflected in the reduced loss amount attributed to defendant, in the recommended role reduction, and in defendant's criminal history category.

Defendant thus has received significant benefits to account for the mitigating circumstances; any further benefit is unwarranted and would not serve the totality of the Section 3553 factors.  The aggravating considerations in this matter, including the seriousness of defendant's offense conduct and the

13

1   need to deter others from such conduct, call for some period of
2   incarceration.

3        Defendant's offense is a serious, for all the reasons noted
4   above.  Defendant systematically targeted individuals who were
5   particularly vulnerable by using his access to the elderly and
6   infirm as a driver at nursing homes.  Defendant took advantage of
7   elderly individuals, including their inability to speak English,
8   by making them believe that they were simply receiving massage
9   treatments and filling out forms for them, resulting in the theft
10  of their identities and Medicare benefits.  For others, defendant
11  took them to the Manor clinic to receive treatment that they
12  believed was legitimate, from supposed medical practitioners who
13  could not even communicate with many of them.  At least one
14  beneficiary was told that "everything was okay" following a sham
15  medical examination, when in fact he could very well have been
16  suffering from a treatable condition.  Indeed, the Manor clinic
17  refused to provide that person with his ultrasound results, which
18  suggests that the ultrasound was itself a sham and that the
19  readings were never even printed out, let alone examined.
20  Moreover, defendant not only put his victims at jeopardy of
21  losing coverage for services they needed, but he also caused the
22  emotional turmoil of dealing with stolen identities.

23       Additionally, the seriousness and nature of defendant's
24  conduct reflects poorly on defendant's character.  Defendant
25  committed the underlying offense simply to line his pockets.  In
26  doing so, defendant wilfully participated in a broad conspiracy
27
28

                                   14

to defraud taxpayer-funded programs designed to benefit the poor and elderly.

A custody sentence is necessary in this case to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a)(1). Imposing a ten-month "split" sentence, five months of which would be served in home confinement under U.S.S.G. § 5C1.1(d)(2), would impress upon defendant the consequences of his criminal behavior, and would send a message to others that the recruitment and identity theft of Medicare beneficiaries is unacceptable conduct that will not be tolerated. 18 U.S.C. §§ 3553(a)(2)(B), (C).

Additionally, pursuant to the parties' stipulation in the plea agreement, the government requests that, as a condition of supervised release, defendant be ordered not work in any capacity, paid or unpaid, for any employer or at any location that stores or otherwise handles information related to health care insurance (including Medicare and Medi-Cal) or that provides any other medical service. Plea Agreement ¶ 2(i).

## V. Conclusion

For the foregoing reasons, the government respectfully recommends that the Court order full restitution in the amount of $13,138, and impose a sentence of ten-months incarceration, five months of which would be served at home as a condition of supervised release, a three-year period of supervised release, and a special assessment of $100.

<u>DECLARATION OF BENJAMIN R. BARRON</u>

I, Benjamin R. Barron, declare and state as follows:

1.    I am an Assistant United States Attorney and am assigned to the prosecution in this matter.  I make this declaration in support of the government's sentencing position as to defendant Vincent Vo.

2.    Attached hereto as Exhibit A are redacted but otherwise true and correct copies of law enforcement reports in this matter.  The law enforcement reports pertain to interviews with five witnesses.  On May 23, 2013, the co-case agent, California DOJ Special Agent Paul Ramirez, informed me of the following:

      a.    All five witnesses speak Vietnamese and do not speak English fluently or at all.

      b.    The ages of the witnesses are as follows:

           i.    S.P.: 67

           ii.   T.L.: 73

           iii.  H.L.: 70

           iv.   Q.T.: 80

           v.    N.P.: 70

3.    Attached hereto as Exhibit B is a true and correct copy of an excerpt from the underlying sworn complaint affidavit.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed May 23, 2013, at Los Angeles, California.

                         /s/
                         BENJAMIN R. BARRON